400 S.E.2d 876

**Roy MASSEY and Ruby Massey**

v.

**JIM CROCKETT PROMOTIONS, INC., a North Carolina Corporation, Licensed to do business in the State of West Virginia; Stan Lane, a/k/a "Sweet Stan," Individually; Bobby Lee Eaton, a/k/a "Beautiful Bobby," Individually; and Jim Cornette, Individually; and Stan Lane, Bobby Lee Eaton, and Jim Cornette, all doing business as "The Midnight Express;" and Freedom Security & Detective Agency, Inc., a West Virginia Corporation.**

No. 19481.

Supreme Court of Appeals of West Virginia.

Dec. 18, 1990.

J. Robert Rogers, Charleston, for Roy Massey, Ruby Massey.

John L. MacCorkle, Meyer, Darragh, Buckler, Bebener Eck & Hall, Charleston, for Jim Crockett Promotions.

E. Elton Byron, Jr., Abrams, Byron, Henderson & Richmond, Beckley, for Lane, Eaton, Cornette & Midnight Express.

F. Alfred Sines, Jr., Beckley, for Freedom Security & Detective Agency, Inc.

PER CURIAM:

The appellants, Roy and Ruby Massey, instituted an action in the Circuit Court of Raleigh County seeking to recover damages for personal injuries alleged to have been caused by the negligence of the appellees, Jim Crockett Promotions, Inc. (hereinafter referred to as Crockett Promotions) and Freedom Security & Detective Agency, Inc. (hereinafter referred to as Freedom Security), in failing to protect Mr. Massey against injuries inflicted upon him by a wrestler while he was attending a wrestling exhibition at the Raleigh County Armory. The Circuit Court of Raleigh County entered an order on June 9, 1989, granting the motion to dismiss filed by Freedom Security,[1] and entered another order on July 17, 1989, granting the motion of Crockett Promotions for summary judgment. The appellants contend that the circuit court erred in granting the appellees' motion to dismiss, and motion for summary judgment. We agree.

On May 29, 1987, Mr. Massey attended a wrestling exhibition at the Raleigh County Armory which had been leased by the promoter of the exhibition, the appellee, Crock-

---

1. The motion to dismiss, or in the alternative for summary judgment, filed by Freedom Security, was based, in part, on Rule 12(b) of the *West Virginia Rules of Civil Procedure.* We note, however, that only matters contained in a pleading can be considered on a motion to dismiss under subdivision (b) of Rule 12, and if matters outside of the pleadings are presented to and considered by the court in its disposition of the motion, the motion should be treated as one for summary judgment pursuant to Rule 56. *United States Fidelity & Guar. Co. v. Eades,* 150 W.Va. 238, 144 S.E.2d 703 (1965). *See also Stemple v. Dobson,* 184 W.Va. 317, 400 S.E.2d 561 (Dec. 12, 1990).

In the case now before us, the trial court considered matters outside of the pleadings in its disposition of the motion filed by Federal Security & Detective Agency, Inc., and therefore, should have treated the motion as one for summary judgment. Thus, in this appeal, we shall treat this as a summary judgment procedure.

ett Promotions.[2] The final event of the wrestling exhibition featured a tag team match between "The Rock 'n' Roll Express" and "The Midnight Express." Stan Lane, known as "Sweet Stan," and Bobby Eaton, known as "Beautiful Bobby," were the two wrestlers on the tag team "Midnight Express" and were managed by Jim Cornette.[3]

The "Rock 'n' Roll Express" was declared the winner of the final match, and was escorted from the ring to their dressing room by security personnel employed by the appellee, Freedom Security.[4] "Sweet Stan" and "Beautiful Bobby" remained in the ring with their manager, Mr. Cornette, awaiting the return of the security personnel so that they could be escorted to their dressing room.[5] While they were standing in the ring, one of the spectators threw an aisle marker into the ring which struck "Beautiful Bobby" on the neck and shoulder. "Sweet Stan," believing that Mr. Massey was the one who threw the aisle marker into the ring, left the ring in pursuit of him. "Sweet Stan" then struck Mr. Massey on the left side of his face, fracturing the orbit of his left eye and other facial bones.[6] Mr. Massey was hospitalized for eight days and had to undergo surgery.

Mr. Massey filed a complaint against Crockett Promotions, Freedom Security, "Sweet Stan," "Beautiful Bobby," and Jim Cornette to recover damages for the injuries he sustained. All of the parties named as defendants in the complaint subsequently moved for summary judgment. By order entered on June 9, 1989, the circuit

court granted the motion to dismiss filed by Freedom Security. Then, by order entered on July 17, 1989, the circuit court granted the motion for summary judgment filed by Crockett Promotions.[7] It is from that order that the appellant now appeals.

The sole issue in this appeal is whether the circuit court erred in granting the motion to dismiss filed by Freedom Security, and the motion for summary judgment filed by Crockett Promotions. The circuit court granted the motions on the grounds that "Sweet Stan" was not acting within the scope of his employment with Crockett Promotions, and that "Sweet Stan's" assault on Mr. Massey was not foreseeable by either Crockett Promotions or Freedom Security.

We stated in syllabus point 3 of *Aetna Casualty & Surety Co. v. Federal Insurance Company of N.Y.*, 148 W.Va. 160, 133 S.E.2d 770 (1963):

A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law.

We further observed in *Aetna Casualty and Surety Co. v. Federal Insurance Company of New York*, 148 W.Va. at 171, 133 S.E.2d at 777, that "[a] party is not entitled to summary judgment unless the facts established show a right to judgment with such clarity as to leave no room for controversy and show affirmatively that the adverse party can not prevail under any circumstances." (citation omitted)

2. Crockett Promotions is in the business of arranging, scheduling and promoting wrestling exhibitions.

3. "Sweet Stan," "Beautiful Bobby," and Jim Cornette each had a contract with Jim Crockett Promotions, Inc.

4. Mr. Massey has alleged that there were fifteen security guards on duty at the wrestling match but that only four were actually guarding the arena. Mr. Massey maintains that the other guards were selling and collecting tickets, and guarding the fire doors to ensure that no one entered who had not paid. This allegation is consistent with the testimony of Robert T. Brady, a stockholder of Freedom Security, who

stated that, in the past, the promoter had used security personnel to "fill positions that the promoter wanted done."

5. Mr. Massey has asserted that while "Sweet Stan," "Beautiful Bobby," and their manager were in the ring, they were "inciting the passions of the crowd."

6. "Sweet Stan" is six feet tall and weighs approximately 245 pounds. The appellant, who is a disabled coal miner in his sixties, is 5'6" tall and weighs approximately 149 pounds.

7. The circuit court denied the motions for summary judgment filed on behalf of "Sweet Stan," "Beautiful Bobby," and Mr. Cornette.

We recently discussed, in *Smith v. Buege,* 182 W.Va. 204, 209, 387 S.E.2d 109, 114 (1989) and *Crain v. Lightner,* 178 W.Va. 765, 769 n. 2, 364 S.E.2d 778, 782 n. 2 (1987), the respective burdens of proof of the parties when a motion for summary judgment has been filed pursuant to Rule 56 of the *West Virginia Rules of Civil Procedure. See also Thornton v. The Town of Eleanor,* 182 W.Va. 634, 390 S.E.2d 833 (1990). We have traditionally recognized that the burden is on the moving party to show that there is no genuine issue as to any material fact in the case. *Smith v. Buege,* 182 W.Va. at 208, 387 S.E.2d at 113; *Crain v. Lightner,* 178 W.Va. at 769, 364 S.E.2d at 782; *Lengyel v. Lint,* 167 W.Va. 272, 279–80, 280 S.E.2d 66, 70, 71 (1981); *Gillespie v. City of Charleston,* 154 W.Va. 565, 177 S.E.2d 354 (1970); *Aetna Casualty & Surety Co. v. Federal Ins. Co. of N.Y., supra.* We have identified two distinct components of this burden of persuasion: "an initial burden of production, which may shift to the nonmovant, and an ultimate burden of persuasion as to the nonexistence of a 'genuine issue' which burden always remain on the movant." *Smith v. Buege,* 182 W.Va. at 209, 387 S.E.2d at 114; *Crain v. Lightner,* 178 W.Va. at 769 n. 2, 364 S.E.2d at 782 n. 2. We further explained in *Smith v. Buege,* 182 W.Va. at 209, 387 S.E.2d at 114, and *Crain v. Lightner,* 178 W.Va. at 769 n. 2, 364 S.E.2d at 782 n. 2:

If the burden of persuasion on the merits at trial would be on the nonmovant, the movant may satisfy the burden of production under Rule 56 in either of two ways. First, the movant may submit affirmative evidence that negates an essential element of the nonmovant's case. Second, the movant may demonstrate to the trial court that the nonmovant has not mustered any evidence to establish an essential element of the nonmovant's case. Where the movant adopts this second option, the movant may not simply make the conclusory assertion that the nonmovant has no evidence. Instead, the movant must affirmatively show the absence of evidence in the record by reviewing for the court the affidavits, if any, discovery materials, etc. [citations omitted].

■ The duty owed to an invited person by the occupant of the premises on which a business or an event, such as a wrestling match, is conducted was explained by this Court in syllabus point 4 of *Puffer v. Hub Cigar Store, Inc.,* 140 W.Va. 327, 84 S.E.2d 145 (1954):

The owner or the occupant of premises owes to an invited person the duty to exercise ordinary care to keep and maintain the premises in a reasonably safe condition. This duty requires the owner or the occupant of premises to exercise ordinary care to protect an invited person from injury inflicted by other persons present on such premises; and if such owner or occupant fails to perform such duty and his negligence is the proximate cause of injuries inflicted upon an invited person by another person such owner or occupant is liable to such invited person.

Moreover, "[t]o be actionable, negligence must be the proximate cause of the injury complained of and must be such as might have been reasonably expected to produce an injury." Syl. pt. 4, *Haddox v. Suburban Lanes, Inc.,* 176 W.Va. 744, 349 S.E.2d 910 (1986); syl. pt. 3, *Hartley v. Crede,* 140 W.Va. 133, 82 S.E.2d 672 (1954). "A person is not liable for damages which result from an event which was not expected and could not reasonably have been anticipated by an ordinarily prudent person." *Haddox, supra,* at syllabus point 5; *Puffer, supra* at syllabus point 6. " 'Foreseeable injury is a requisite of proximate cause, and proximate cause is a requisite for actionable negligence, and actionable negligence is a requisite for recovery in an action for personal injury negligently inflicted.' *Osborne v. Atlantic Ice and Coal Company,* 207 N.C. 545, 177 S.E. 796." *Haddox, supra,* at syllabus point 6; *Puffer, supra,* at syllabus point 7.

■ Finally, we have recognized that questions of negligence, proximate cause and due care are usually factual ones, as we stated in syllabus point 17 of *Anderson*

*v. Moulder*, 183 W.Va. 77, 394 S.E.2d 61 (1990):

' "Questions of negligence, due care, proximate cause and concurrent negligence present issues of fact for jury determination when the evidence pertaining to such issues is conflicting or where the facts, even though undisputed, are such that reasonable men may draw different conclusions from them." Syl. pt. 1, *Ratlief v. Yokum* [167 W.Va. 779], 280 S.E.2d 584 (1981), *quoting,* syl. pt. 5, *Hatten v. Mason Realty Co.*, 148 W.Va. 380, 135 S.E.2d 236 (1964).' Syllabus Point 6, *McAllister v. Weirton Hosp. Co.*, [173] W.Va. [75], 312 S.E.2d 738 (1983).

From the record we find that, in addition to the testimony of the parties to this action taken at depositions, witnesses to the incident, none of whom knew Mr. Massey, also gave depositions. Edward Vaught, one of the security personnel who was working at the armory the night of the incident, testified that, prior to the assault on Mr. Massey, there was an incident in which one of the spectators was "going after Mr. Cornette." Mr. Vaught testified that after he assisted the other security guards in removing the spectator from the arena, he saw the aisle marker being thrown into the ring. He testified that Mr. Massey did not throw the aisle marker at "Sweet Stan." Mr. Vaught testified that he was unable to stop "Sweet Stan" from hitting Mr. Massey, and that Mr. Massey fell to the floor after being struck by "Sweet Stan." Mr. Vaught testified that following the incident, he was advised that the wrestlers and their manager wanted to see Mr. Massey in their dressing room. Mr. Vaught believed that they wanted to apologize to Mr. Massey. Instead, Mr. Vaught testified that when he took Mr. Massey back to their dressing room, "Sweet Stan" and Jim Cornette "were throwing remarks at Mr. Massey, about him being a drunken hillbilly, never worked a day in his life, things of this nature."

Elizabeth F. Carter, an employee of Am Star Ambulance Service, who was hired to assist anyone who was sick or injured at the wrestling exhibition, also testified that it was not Mr. Massey who threw the aisle marker. Ms. Carter testified that there were no security personnel in the area at that time. She stated that after "Sweet Stan" struck Mr. Massey, "[h]e turned around and walked back to the ring where Beautiful Bobby was." Ms. Carter testified that she also escorted Mr. Massey back to the dressing room under the belief that the wrestlers and manager wanted to apologize to him. Ms. Carter stated, however, that Mr. Cornette verbally abused Mr. Massey, and that "Beautiful Bobby" and "Sweet Stan" were "drawing back like they was going to hit Mr. Massey."

Joseph DeCostley Clark, a spectator at the wrestling exhibition, also testified that a young man had thrown the aisle marker at "Sweet Stan," and that there were no security personnel in the area at that time. He further testified that immediately prior to the assault on Mr. Massey by "Sweet Stan," there had been a "disturbance" on another side of the arena. Mr. Clark also escorted Mr. Massey back to the wrestlers' dressing room under the belief that they intended to apologize to Mr. Massey. Mr. Clark stated that Mr. Cornette used obscene language and stated that Mr. Massey "was a dirty son-of-a-bitch and ought to be kicked off the face of the earth." Mr. Clark stated, however, that neither "Beautiful Bobby" nor "Sweet Stan" made any statements to Mr. Massey.

Crockett Promotions did not discuss the depositions of any witnesses in its motion for summary judgment. It merely asserted that the tortious conduct of an employee outside of the employee's scope of employment does not confer liability upon his employer, and that "Sweet Stan's" actions were clearly outside the scope of his employment with Crockett Promotions. In its motion, Freedom Security asserted that there was nothing in Mr. Massey's deposition which indicated that Freedom Security was negligent in the performance of its duties at the wrestling exhibition.

Mr. Massey maintains on appeal, however, that "Sweet Stan," his manager, and the other wrestlers were employed to en-

tertain and incite the spectators attending the wrestling exhibition, and that "Sweet Stan" was acting within the scope of his employment with Crockett Promotions.[8] He further contends that it was clearly foreseeable that the provocation of the crowd by "The Midnight Express" and their manager would result in injury.[9] Mr. Massey also avers that there were insufficient security personnel in the arena to control the crowd.[10]

Clearly, there are issues in the case before us which are necessary for a jury to resolve. Crockett Promotions, as the organizer, sponsor, and promoter of the wrestling exhibition, was required to anticipate foreseeable happenings and to use ordinary care to prevent injury to patrons. Part of this duty to exercise ordinary care included arranging for a sufficient number of security personnel to control the crowd. Freedom Security also had a duty to exercise ordinary care by ensuring that there were adequate security guards stationed in the arena to control the crowd to prevent any injuries.[11] Thus, there are questions

8. There was evidence which indicated that the wrestlers and their manager were to provoke the crowd as part of their performance. For example, Edward Vaught, one of the security guards who was working at the armory the night of the incident, gave the following testimony at a deposition regarding Mr. Cornette's conduct toward Mr. Massey after "Sweet Stan" had assaulted him. He stated: "Mr. Cornette, I don't know, whether it's just something to build up for his reputation, his image he's suppose to hold or what. If you watch the program, he's all the time running his mouth, so I just gathered that this was something that he was supposed to do in this incident."

Mr. Massey also testified regarding Mr. Cornette's performance during the matches. He stated that Mr. Cornette hit one of the wrestlers of the "Rock and Roll Express" in the back with a tennis racket. Mr. Massey also testified that the spectators were throwing paper and "different things like that" into the ring during the matches.

Furthermore, "Sweet Stan" testified in a deposition that, at the end of the match, the crowd was "booing" them, "getting rather irate," and throwing things at them such as "[b]alled up paper cups with ice in them, coins, ... general refuse."

9. Mr. Brady testified that his security personnel had previously encountered difficulty at other wrestling matches with the crowds and with spectators attacking the wrestler. In fact, on the night of the incident in the case before us, Mr. Vaught, one of Mr. Brady's employees, testified that there was another incident prior to the assault on Mr. Massey. Mr. Vaught responded to the following questions at a deposition:

Q Had you all had any incidents earlier that evening?

A Just right before the incident with Mr. Massey an individual, I don't know his name right off, had jumped over the railing on the section on side C. The man was intoxicated. I at first reached across to get him by the arm and try to get him back, and he jerked away from me, and Mr. Cornette was standing right about here and he was going after Mr. Cornette.

Q Was this during the match?

A Yeah. And his remark to me—when I grabbed him, he jerked away from me. Evidently, he'd just had enough to drink to, you know, make him brave. His remark to me was that nobody was going to stop him from getting to Mr. Cornette. So I then jumped over the railing and walked up behind him and just grabbed him in a full Nelson and escorted him on around this section. Another guard, Bobby Adkins, was at this side, Johnny Roark was at the far side where the wrestlers went back, and Tim, I think it was Tim Jones was stationed over here. When I went around this way, the other guards helped me grab this individual by the legs and arms and we escorted him out the back door.

10. Elizabeth F. Carter, an employee of the Am Star Ambulance Service, also gave the following testimony at a deposition on December 30, 1988:

Q. Did you see where the aisle marker went?

A. Yes, sir. It went up in the ring and hit Beautiful Bobby in the shoulder.

Q. What happened at that point?

A. Well, when the boy saw that the sign had connected with Beautiful Bobby's shoulder, he ran out the bay doors.

Q. Did you watch him from the time that he threw it—

A. Till the time he ducked underneath the bay door.

Q. Were there any security personnel in the area where he threw the aisle marker?

A. No, sir.

11. Mr. Brady, a stockholder of Freedom Security, testified that the armory had requested he provide twelve security guards for the wrestling exhibition, but that he knew from previous experience he needed fifteen. There were in excess of 4,000 people attending the wrestling match. From the testimony of Mr. Brady regarding other wrestling matches his company was hired to guard, there was evidence from

as to whether it was foreseeable that there would be an altercation between one of the wrestlers and a spectator in the crowd as a result of the wrestlers and their manager provoking the crowd, and as to whether there were sufficient security personnel in the arena to control the crowd. There are also questions as to whether: (1) Mr. Massey threw the aisle marker at "Sweet Stan"; (2) it was in the course of "Sweet Stan's" employment with Crockett Promotions to provoke and incite the spectators at the wrestling exhibition; and (3) Crockett Promotions and Freedom Security failed to exercise ordinary care to protect Mr. Massey from injury.

Therefore, we find that the circuit court erred in granting summary judgment in favor of the appellees. Accordingly, the order of the Circuit Court of Raleigh County is reversed and this matter is remanded for further proceedings.

Reversed and remanded.

which a jury could infer that fifteen guards were not sufficient to control a crowd of over 4,000, especially when the guards are also assigned to perform duties for the promoters. Therefore, summary judgment should have been precluded.